1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LATIKA TANEJA, et al.,

              Plaintiffs,

    v.

ALINNE CINTRA FREITAS, et al.,

              Defendants.

CASE NO. 2:22-cv-00702-TL

ORDER ON SUMMARY JUDGMENT

This case arises from a failed transaction involving the sale of Defendants' home and residential daycare business to Plaintiffs. This matter is before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 26) and Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 31). Having considered the relevant record and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court GRANTS in part and DENIES in part Defendants' motion and DENIES Plaintiffs' motion.

1

I.   BACKGROUND

2   **A.   Factual Background**

3           Alinne and Pedro Freitas owned a home in Kirkland, Washington, out of which they ran a

4   daycare business called Love Laugh Learn Daycare LLC (collectively, Defendants). Pedro

5   received a job offer that required the couple to relocate to Florida. The Freitas advertised both

6   their home and business for sale. Plaintiffs Latika Taneja, Navneet Taneja, Viral Desai, and

7   Dharitri Desai were partners in a separate commercial daycare business called Stepping Stones

8   Kids Academy in nearby Redmond, Washington. Plaintiffs approached Defendants about

9   purchasing both the residential daycare business and real property. They pursued an agreement

10  that ultimately failed. The Parties dispute many of the factual details regarding their failed

11  agreement and their relevance to this case, but much of their course of dealings up to and after

12  the deal fell apart appears to be generally uncontested. The undisputed facts regarding those

13  events follow.

14          Due to the inclusion of the home purchase, both Parties separately engaged real estate

15  agents to assist them with the transaction. Plaintiffs were advised that it would be best to pursue

16  two separate transactions, one for the real property and another for the business sale, but the

17  Parties chose to proceed with the deal as a single transaction. Ultimately, the Parties agreed to a

18  total purchase price of $1.65 million for the combined real property and business. The Parties

19  memorialized their agreement using standard Real Estate Purchase and Sale Agreement forms

20  and related addenda (the "REPSA"), which indicated a closing date of March 3, 2022. As part of

21  the REPSA, Plaintiffs agreed to provide $100,000 in earnest money, subject to conversion to a

22  non-refundable deposit under specified conditions, and expressly waived several contingencies.

23  These waivers included a Waiver of Inspection disclaiming reliance on any prior representation

24  regarding the condition of the real property or suitability of the property for Plaintiffs' intended

use. The REPSA also included a "Buyer Advisory" regarding the risks of waiving contingencies and providing non-refundable earnest money.

During the course of dealings leading to the final agreement, Defendants responded to Plaintiffs' inquiries about the residential daycare business, including by representing to Plaintiffs that they were able to operate at a slightly higher capacity (by accepting up to 18 children, as opposed to a maximum of 12) because of an exception during the Covid pandemic (a "Covid waiver") approved by the state licensing authority, the Washington State Department of Children, Youth, and Families ("DCYF"). Defendants also provided information regarding the business, including financial statements showing its profitability while operating at the higher capacity. Plaintiffs, as commercial daycare operators, were aware that DCYF approval was required before the residential daycare license could be transferred as part of the transaction. Plaintiffs expressly conditioned the deal on license transfer. Defendants began working with DCYF to secure license transfer approval.

In turn, Plaintiffs began working to secure financing for the transaction. For various reasons, including Defendants' wish for the deal to close as quickly as possible, Plaintiffs pursued financing for the deal through a residential real estate loan from Key Bank. This meant that Plaintiffs were not able to represent in the financing agreements with Key Bank that the loan was also intended to purchase a business as part of the real estate transaction. Because the final agreed-upon combined purchase price included the anticipated value of both the real property and business, the bank's appraisal of the property was significantly lower than the total purchase amount agreed upon. Plaintiffs therefore agreed to fund any amount not covered by the real estate loan from their personal funds and agreed to a financing contingency waiver in the REPSA. By providing this waiver, Plaintiffs fulfilled the REPSA condition that converted the

$100,000 earnest money payment to a non-refundable deposit. Per the REPSA, the deposit would only have to be returned under certain conditions, including if Defendants breached the contract.

After mutually agreeing to the terms of the REPSA, but before the agreed-upon closing date, DCYF informed Defendants that their residential daycare license was suspended and that they must immediately stop operating their daycare business. Defendants complied by shutting down the daycare but immediately attempted to contact DCYF to clarify or remedy the stated infractions that lead to the suspension. Upon learning of the license suspension, through counsel, Plaintiffs expressed their intent to terminate the deal and demanded that Defendants return the earnest money and preserve records related to the deal in anticipation of potential litigation. On March 3, 2022, the previously agreed-upon closing date, neither party performed under the contract. A week after the closing date, DCYF sent Defendants a letter confirming that their residential daycare license was no longer suspended.

Defendants retained counsel, who responded to Plaintiffs' demand by referencing the REPSA's terms regarding the non-refundable deposit and asserting that Defendants were within their rights to retain the $100,000. The transaction having failed, Defendants also proceeded to sell their home to a separate buyer and abandoned their residential daycare business when they relocated to Florida. Defendants also admit to failing to preserve records related to the daycare business during their relocation despite having received Plaintiffs' demand letter.

Plaintiffs then commenced this action for the return of the $100,000 earnest money and for other damages, raising claims of breach of contract, fraudulent inducement, negligent misrepresentation, conversion, and unjust enrichment.

**B.     Relevant Procedural History**

The Parties filed cross motions for summary judgment. Dkt. Nos. 26, 31. The Parties timely responded to each other's motions (Dkt. Nos. 36, 41) and filed replies (Dkt. Nos. 38, 46).

The Parties also attempted to submit additional briefing related to the summary judgment motions, but those docket entries were struck by the Court as procedurally improper. *See* Dkt. No. 66 (striking Dkt. Nos. 51–53, 55–56, and 61–65).

While the summary judgment motions were pending, the Court granted in part and denied in part Defendants' Motion to Compel Testimony and Production of Documents. Dkt. No. 45. In its order, the Court compelled Plaintiffs to produce certain improperly withheld text messages and authorized Defendants to "move for sanctions related to the same messages within five (5) days of the production of the messages, if appropriate." *Id.* at 8. Defendants moved for sanctions (Dkt. No. 49) and provided notice of intent (Dkt. No. 74) to supplement their summary judgment motion related to the belatedly produced text messages as provided by the Court's order granting sanctions (Dkt. No. 73). The Court continued the previously scheduled trial and related deadlines, reset the noting dates for the pending summary judgment motions, and authorized limited supplemental briefing on Defendants' pending summary judgment motion. Dkt. No. 76. The Parties' supplemental briefing has been filed. *See* Dkt. Nos. 79, 81, 84.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, the Court does not make credibility determinations, nor does it weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *accord Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021). The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251– 52. A genuine triable issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also McSherry v. City of*

*Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (explaining that this is the inquiry at the summary judgment stage, "[s]tripped to its core"). Additionally, "all justifiable inferences" must be drawn in the non-movant's favor, *Liberty Lobby, Inc.*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)), "only in the sense that, where the facts specifically averred by [the non-moving] party contradict facts specifically averred by the movant, the [summary judgment] motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

To establish that a fact cannot be genuinely disputed, the movant can either cite the record or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Once the movant has made such a showing, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted); *accord In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010); *see also Liberty Lobby, Inc.*, 477 U.S. at 252 (specifying that the non-movant "must show more than the mere existence of a scintilla of evidence"). The non-movant "bears the burden of production under [FRCP] 56 to 'designate specific facts showing that there is a genuine issue for trial.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The Court will enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *see also Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798, 805 (9th Cir. 2010) (affirming grant of summary judgment against appellant who "failed to adduce any evidence or authority to support her claim").

1    "[W]hen parties submit cross-motions for summary judgment, each motion must be

2    considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249

3    F.3d 1132, 1136 (9th Cir. 2001) (citations and quotation omitted). The court rules on each

4    motion "on an individual and separate basis." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d

5    1151, 1156 (9th Cir. 2015) (quoting 10A Charles Alan Wright et al., Federal Practice and

6    Procedure § 2720 (3d ed. 1998)).

7                                    **III.    DISCUSSION**

8          The Parties cross move for summary judgment as to Defendants' liability for breach of

9    contract and fraudulent inducement, while Defendants also seek summary judgment dismissal of

10   Plaintiffs' claims of negligent misrepresentation, conversion, and unjust enrichment, as well as

11   dismissal of all of Plaintiffs' claims under the doctrine of unclean hands.[1] Dkt. Nos. 26, 31.

12   Defendants also seek costs and fees. Dkt. No. 26 at 33.

13         In opposition to Plaintiffs' motion, Defendants move to strike Plaintiffs' request for

14   spoliation sanctions, which Plaintiffs rely on throughout their motion. Dkt. No. 41 at 28–29. The

15   Court will address the motion to strike and request for sanctions before turning to the specific

16   claims on summary judgment.

17   **A.    Preliminary Matters**

18         Before addressing the pending motions, the Court finds a need to address some

19   preliminary concerns regarding Plaintiffs' briefing. In all of Plaintiffs' briefing on summary

20   judgment, the prior motion for sanctions, and subsequent supplemental briefing allowed by the

21   Court, Plaintiffs chose to include all record citations in footnotes. *See* Dkt. Nos. 31, 36, 46, 57,

22

23   [1] Plaintiffs' claims are before the Court on diversity jurisdiction per 28 U.S.C. § 1332, and venue is proper because all of the alleged acts occurred in the state of Washington. *See* Dkt. Nos. 1, 1-3. The Court therefore applies Washington state substantive law in assessing Plaintiffs' contract and tort claims. *See Erie R.R. Co. v. Tompkins*,

24   304 U.S. 64, 77–78 (1938); *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

81. This Court's Chambers Procedures regarding motions practice expressly states that "footnotes are to be reserved for explanatory and supplemental information[, and c]itations . . . must be included in the body of the briefing, not footnotes or endnotes." Judge Tana Lin, Standing Order for All Civil Cases, Section II.A (last updated June 16, 2023).[2] While the Court might normally excuse such a modest oversight, the Court notes that this is not the first time Plaintiffs have failed to heed the applicable rules of practice before this Court. *See* Dkt. No. 23 (notice of deficiency for Plaintiffs' overlength motion briefing and missing word count certification). The Court also notified all Parties of its expectation that participants in the litigation be familiar with its Chambers Procedures and other relevant rules at the outset of this case. *See* Dkt. No. 5. Further, the Parties were specifically ordered to refile an amended Joint Status Report because they initially failed to submit required certifications, which include "a certification that all counsel and any pro se parties have reviewed Judge Lin's Chambers Procedures." *See* Dkt. No. 10; *see also* Dkt. No. 11 (providing the required certification from Plaintiffs' counsel).

    While Defendants' briefing appears to be compliant with all relevant procedural rules, the docket is replete with procedural admonishments to both Parties. *See, e.g.*, Dkt. Nos. 2, 10, 15, and July 8, 2022, Notice to Filer. As such, this will be the Parties' final warning regarding compliance with relevant procedural rules and standards for practicing before this Court. Any future noncompliant filings may be summarily struck from the docket, denied on procedural grounds, or warrant other sanctions as appropriate.

---

[2] https://www.wawd.uscourts.gov/sites/wawd/files/LinStandingOrderreCivilCases_0.pdf.

**B.**     **Motion to Strike and Request for Spoliation Sanctions**

Throughout their briefing on the dueling motions for summary judgment, Plaintiffs assert that Defendants committed "wholesale spoliation of evidence" related to this litigation. *See, e.g.*, Dkt. No. 31 at 9, 23; *see also* Dkt. No. 36 at 9, 15; Dkt. No. 46 at 10–14. In seeking partial summary judgment, Plaintiffs specifically ask the Court to impose, at least, the "minimum sanction" of accepting certain inferences regarding the spoliated evidence that are adverse to Defendants' arguments on summary judgment. Dkt. No. 31 at 26. The Court understands Plaintiffs' request for an adverse inference in this context to be limited to the summary judgment standard requiring inferences to be otherwise drawn in favor of the non-movant. *See Liberty Lobby, Inc.,* 477 U.S. at 255.

In response, Defendants move to strike Plaintiffs' request for sanctions as an untimely discovery motion. Dkt. No. 41 at 28. The Court can issue spoliation sanctions under Federal Rule of Civil Procedure ("FRCP") 37, governing discovery disputes, or under its "inherent power [as a] federal court[] . . . in response to abusive litigation practices." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Defendants correctly assert that Plaintiffs failed to raise the alleged spoliation prior to the Court-ordered deadline for filing discovery-related motions, including motions for sanctions under FRCP 37. Dkt. No. 41 at 28–29. To pursue such an untimely motion, Plaintiffs would need to show good cause for relief from the Court-ordered deadline per FRCP 16. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) ("A scheduling order is not a frivolous piece of paper, idly entered, which can be disregarded by counsel without peril." (citation and internal quotation marks omitted)). Plaintiffs do not attempt to show good cause for failing to raise the spoliation issue as a discovery sanction and rely instead on the Court's "inherent power to regulate the litigation process." Dkt. No. 46 at 10.

1     Under its inherent authority, the Court generally has "'broad discretion to make discovery

2 and evidentiary rulings conducive to the conduct of a fair and orderly trial.'" *Unigard Sec. Ins.*

3 *Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (quoting *Campbell*

4 *Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980)). The imposition of an adverse inference

5 as a sanction for spoliated evidence

> is based on two rationales, one evidentiary and one not. The
> evidentiary rationale is nothing more than the common sense
> observation that a party who has notice that a document is relevant
> to litigation and who proceeds to destroy the document is more
> likely to have been threatened by the document than is a party in the
> same position who does not destroy the document. . . .
>
> The other rationale for the inference has to do with its prophylactic
> and punitive effects. Allowing the trier of fact to draw the inference
> presumably deters parties from destroying relevant evidence before
> it can be introduced at trial.

12 *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (omission in original) (quoting

13 *Nation–Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218 (1st Cir. 1982)). But

14 "[b]ecause of [its] very potency, [the Court's] inherent power[ to impose sanctions] must be

15 exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)

16 (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980)).

17     Here, the Court finds that the undisputed facts warrant consideration of Plaintiffs' request

18 for some form of adverse inference sanctions for Defendants' failure to preserve files related to

19 the daycare business that was an integral part of the failed transaction from which this lawsuit

20 arises. As such, the Court DENIES Defendants' motion to strike.

21     The Court will, as it deems necessary within its broad discretion, consider Defendants'

22 failure to preserve evidence in determining what, if any, inferences can be drawn from the facts

23 presented by the respective Parties on summary judgment. But, unlike a factfinder at trial, the

24 Court on summary judgment is not permitted to make credibility determinations or weigh the

1    evidence presented. *Liberty Lobby, Inc.*, 477 U.S. at 255. Thus, to the extent any adverse

2    inferences are drawn against Defendants on these grounds, the adverse inferences will "be

3    carefully fashioned to deny [Defendants] the fruits of [their unpreserved files] yet not interfere

4    with that party's right to produce other relevant evidence." *In re Oracle Corp. Sec. Litig.*, 627

5    F.3d at 386–87. Additionally, for any claim that survives summary judgment, the Court's

6    adverse inferences on summary judgment will not necessarily control or limit any evidentiary

7    matters at trial, and the issue of what adverse inferences the factfinder may consider at trial will

8    need to be reassessed, if necessary, at a more appropriate time.

9    **C.    Breach of Contract**

10           To recover on a claim for breach of contract, a plaintiff must prove: (1) a valid contract;

11   (2) the defendant's breach of that contract; and (3) resulting damage to the plaintiff. *Lehrer v.*

12   *State, Dep't of Soc. and Health Servs.*, 5 P.3d 722, 727 (Wash. App. 2000). Plaintiffs assert that

13   Defendants are liable for anticipatorily breaching their contract. Dkt. No. 31 at 17–21.

14   Defendants contend that they cannot be held liable for breach because they were excused from

15   performing under the contract by Plaintiffs' anticipatory repudiation prior to the agreed-upon

16   closing date. Dkt. No. 26 at 20–23. Alternatively, Defendants argue that liability for non-

17   performance cannot attach under the contract because of the failure of a condition precedent.

18   Dkt. No. 24–25. As discussed below, the Court finds that the undisputed facts show that a

19   condition precedent was never satisfied, and therefore liability for breach of contract cannot be

20   found as a matter of law.

21           **1.    Failure of Condition Precedent**

22           Defendants argue that DCYF's approval of the daycare license transfer was a condition

23   precedent to performance of the contract that was not satisfied prior to the transaction closing

24   date. Dkt. No. 26 at 24.

A contractual duty is distinct from a condition precedent. *See Tacoma Northpark, LLC v. NW, LLC*, 96 P.3d 454, 457 (Wash. App. 2004). The failure to perform a contractual duty, or a promise, exposes the promisor to breach of contract liability unless impossibility of performance can be proven. *Id.* However, conditions precedent are "'those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.'" *Id.* (quoting *Ross v. Harding*, 391 P.2d 526, 530 (Wash. 1964)). The nonoccurrence of a condition precedent "prevents the promisor [ ] from acquitting a right . . . or deprives it of one, but it does not subject the promisor to liability." *Id.* Whether a contract provision is a contractual obligation or condition precedent is a question of law that depends on the intent of the parties. *Id.* A court determines the parties' intent from a "fair and reasonable construction of the language used, taking into account all the surrounding circumstances." *Id.*

Here, Defendants highlight Plaintiffs' own insistence that the transaction be contingent on transfer of the daycare license. Dkt. No. 26 at 25; *see also* Dkt. No. 31 at 19–20. Defendants further highlight the fact that DCYF's discretionary approval was required before the license could be transferred. Dkt. No. 26 at 25. The facts also show that Defendants were actively working toward DCYF approval up to—and even after—DCYF suspended the daycare license. Dkt. No. 26 at 11; Dkt. No. 33-5 at 81–82 (179:23–180:16); Dkt. No. 33-31. Although DCYF eventually lifted the suspension (Dkt. No. 33-14), there is no evidence in the record of DCYF ever granting approval of the license transfer.

Plaintiffs do not dispute any of these facts. *See* Dkt. No. 31 at 19 ("[T]he transaction included the transfer of the Daycare and, *as a contingency*, the transfer of the License" (emphasis added)) and 20 ("**There was a contingency on the transfer of the license.**" (emphasis in

original)).[3] Instead, Plaintiffs attempt to argue that Defendants' alleged anticipatory breach precludes summary judgment as to failure of the condition precedent. Dkt. No. 36 at 18. The Court notes that Plaintiffs provide neither factual nor legal authority to substantiate this argument in their opposition on this issue. *See id.* In any event, Plaintiffs' argument misses the point. Because Plaintiffs expressly conditioned the transaction on license transfer, which was clearly contingent on DCYF approval, neither party had a duty to perform under the agreement unless and until DCYF approval was received. *See Tacoma Northpark*, 96 P.3d at 457. DCYF approval was never received. As such, Defendants cannot be liable for breaching the contract by failing to transfer the license (or any other consideration) on the closing date as a matter of law.

## 2.      Anticipatory Breach or Repudiation

Both Parties argue that the opposing party anticipatorily breached or repudiated the contract prior to the closing date. *See* Dkt. No. 26 at 20–23; Dkt. No. 31 at 17–21. Defendants' supplemental briefing also relies heavily on the belatedly disclosed text messages as evidence of Plaintiffs' intent to prematurely terminate the agreement. Dkt. No. 79 at 6–8; Dkt. No. 84 at 6–8. The Court's conclusion that there was a failure of a condition precedent precludes a finding of anticipatory breach as to either party, as discussed above. As such, Defendants' alternative arguments for summary judgment because of Plaintiffs' alleged anticipatory repudiation are moot, and Plaintiffs' arguments as to anticipatory breach fail as a matter of law.

The Court therefore DENIES Plaintiffs' motion as to Defendants' liability for breach of contract, GRANTS Defendants' motion as to this claim, and DISMISSES Plaintiffs' cause of action for breach of contract.

---

[3] Further, when Defendants asserted that the license transfer was not a contingency, Plaintiffs responded, "a little surprised with your response. License transfer is still in jeopardy? if license transfer doesn't happen, then?" Dkt. No. 31 at 11.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**D.      Fraudulent Inducement**

Both Parties argue that the undisputed facts of this case require summary judgment as to Defendants' liability for fraudulent inducement. Dkt. No. 26 at 28–30; Dkt. No. 31 at 21–26. Plaintiffs must establish nine elements to succeed on their cause of action for fraudulent inducement:

> (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that it be acted upon by the person to whom it is made, (6) ignorance of its falsity on the part of the person to whom the representation is addressed, (7) the latter's reliance on the truth of the representation, (8) the right to rely upon it, and (9) consequent damage.

*Elcon Const., Inc. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012). All nine elements must be established by "clear, cogent, and convincing evidence" for the claim to succeed. *Id.* Defendants argue that the facts do not support this cause of action, as a matter of law, regarding either of the two specific representations that Plaintiffs allege in the Complaint fraudulently induced them to enter the agreement. Dkt. No. 26 at 28–30. Thus, to survive Plaintiffs' motion, Defendants need only raise a dispute of material fact as to any of the required elements. But to prevail on their summary judgment motion, Defendants must show that the undisputed facts fail to establish at least one of the material elements of the cause of action as a matter of law. *See Celotex*, 477 U.S. at 322.

**1.      First Element: Representation of Existing Fact**

Defendants note that Plaintiffs' Complaint asserts two purportedly fraudulent representations of then-existing facts: (1) that Defendants would be able to transfer the daycare license and (2) that Defendants had secured a Covid waiver that allowed them to operate their residential daycare business at a higher-than-normal capacity. Dkt. No. 26 at 28 (citing Dkt. No. 1-3 ¶¶ 125–26). In opposition to Defendants' motion, Plaintiffs appear to abandon any claim

regarding the license transfer representation and focus only on the Covid waiver representation. Dkt. No. 36 at 23 ("Plaintiffs' fraudulent inducement claim doesn't rest on a claim that Defendants failed to transfer the License."). This comports with Plaintiffs' motion, which also focuses only on the Covid waiver representation. Dkt. No. 31 at 21. As such, the Court will address only that representation.

The undisputed facts appear to establish that Defendants did make the purported Covid waiver representation (*see, e.g.,* Dkt. No. 31-4 at 50–52 (52:12–54:5)). Defendants do not appear to dispute that the representation was made. Dkt. No. 26 (challenging only the third, fourth, seventh, and eighth elements as relates to the Covid waiver representation). Thus, this element is sufficiently established as to the Covid waiver representation.

### 2.  Second, Fifth, and Sixth Elements: Materiality, Defendants' Intent to Induce Action, and Plaintiffs' Ignorance as to Falsity of Representation

Plaintiffs argue that undisputed facts establish that the Covid waiver representation was material to their decision to enter the agreement, that Defendants made the representation with the intent of encouraging Plaintiffs to proceed with the transaction, and that Plaintiffs had no way of knowing that the representation may have been false. Dkt. No. 31 at 21–22. Defendants do not appear to dispute any of Plaintiffs' assertions on these elements. *See* Dkt. No. 41 at 26; *see also* Dkt. No. 26 at 29. The Court agrees that there does not appear to be any dispute of fact on these elements and finds that they are established for the purpose of summary judgment on this claim.

### 3.  Third and Fourth Elements: Falsity and Defendants' Knowledge of Falsity

Plaintiffs argue that Defendants made the representation regarding the Covid waiver knowing that it was false. Dkt. No. 31 at 21–22. Here, Plaintiffs rely almost entirely on the fact that Defendants were unable to produce documentary proof of receiving a waiver in writing from DCYF in discovery, due to their failure to preserve daycare-related files, and that DCYF

1    suspended the residential daycare license in part because the daycare was operating over the

2    standard 12-child capacity. *Id.* Plaintiffs urge the Court to draw the broad adverse inference, as a

3    sanction, that Defendants knew that they had never received a waiver and "knowingly and

4    repeatedly lied to Plaintiffs" about their approval to operate over capacity. *Id.* at 23. This is a

5    bridge too far.

6           However, the Court will not accept any argument that the despoiled files would have

7    proven that a Covid waiver existed. Even applying the adverse inference that Defendants cannot

8    present documentary proof that they ever had a Covid waiver, there are sufficient facts in the

9    record to raise a genuine dispute as to Defendants' belief that they were operating the daycare in

10   compliance with DCYF regulations, and that any violation was simply an innocent

11   misunderstanding. A factfinder could reasonably conclude that the evidence of Defendants'

12   forthrightness regarding their actual operating capacity, responsiveness to DCYF inquiries

13   throughout the license transfer approval process, and promptness with which they acted in

14   response to the DCYF suspension, ultimately resulting in the swift reinstatement of their license

15   (*see* Dkt. No. 26 at 32), all support Defendants' assertion that they truly believed they were

16   operating under a Covid waiver at the time they made the representations.

17          The Court notes that a reasonable factfinder could also conclude that none of these facts

18   overcome the lack of documentary proof of waiver and would have the privilege of weighing the

19   credibility of witness testimony along with the failure to preserve the daycare files in

20   determining what inferences to draw at trial. But such credibility determinations and weighing of

21   evidence are inappropriate at the summary judgment stage. *Liberty Lobby, Inc.*, 477 U.S. at 255.

22   Rather, "credibility determination, the weight of the evidence, and the drawing of legitimate

23   inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion

24   for summary judgment." *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). The Court

therefore finds that there is a genuine dispute of fact as to these elements. Consequently, the

Court DENIES Plaintiffs' motion as to Defendants' liability for fraudulent inducement.

Although Plaintiffs' motion fails on this issue, the Court will review the remaining

elements challenged by Defendants in their motion. To survive summary judgment, Plaintiffs

must at least show that a dispute of fact exists as to the remaining elements being challenged. *See*

*Celotex*, 477 U.S. at 322 (holding that summary judgment is appropriate if there is no dispute of

fact regarding a party's inability to establish "an element essential to that party's case, and on

which that party will bear the burden of proof at trial").

### 4.     Seventh and Eighth Elements: Plaintiffs' Reliance and Right to Rely

Defendants assert that Plaintiffs cannot rely on any collateral representations because

they agreed to the Inspection Waiver Addendum in the REPSA. Dkt. No. 26 at 29. Defendants

further note that Plaintiffs, as commercial daycare operators, knew the terms of the daycare

license after transfer were contingent on DCYF approval, including the right to operate at an

increased capacity due to Covid. *Id.* Defendants argue that Plaintiffs therefore cannot establish

that they had any right to rely on Defendants' representation that the waiver had previously been

secured. *Id.* Nor was it reasonable for Plaintiffs, who are sophisticated daycare operators, to rely

on the representation as assurance that they would be able to continue to operate the purchased

daycare at an increased capacity after transfer. *Id.*

Plaintiffs counter by pointing to facts from which a factfinder could reasonably conclude

that the Parties intended the Inspection Waiver Addendum, and its attendant disclaimer of prior

representations, to govern only representations about the condition of the real property that was

included in the transaction and not representations about the daycare business itself. Dkt. No. 36

at 23. The Court notes that Plaintiffs' arguments on this point are considered through the lens of

Defendants' decision not to assert a defense based on the REPSA's integration clause and to

instead accept "*arguendo* there was an agreement to sell the Property, Daycare, and transfer the License for the single combined purchase price of $1.65M, and that the agreement is memorialized in the REPSA and Email" communications between the Parties.[4] Dkt. No. 26 at 20. Thus, the Court must consider the evidence of the negotiated agreement beyond the REPSA, along with evidence regarding the Parties' general course of dealing, including Plaintiffs' reliance on the profit and loss statements and financial valuation of the business portion of the transaction (versus the real estate portion) in deciding to proceed with the deal as memorialized in the REPSA and relevant email communications. *See* Dkt. No. 36 at 23–24. From these facts, the Court finds sufficient disputes of fact exist as to Plaintiffs' actual reliance and right to rely on the Covid waiver representation.

The above-noted disputes of fact preclude the Court from granting summary judgment to either Party on this issue.[5] The Court therefore DENIES both Plaintiffs' and Defendants' motions on this issue, and Plaintiffs' fraudulent inducement claim shall proceed to trial.

## E.    Negligent Misrepresentation

Although the elements for a negligent misrepresentation claim differ substantively from a fraudulent inducement claim, they both similarly require proof of justifiable reliance on an allegedly false representation. *Compare Laws. Title Ins. Corp. v. Baik*, 55 P.3d 619, 623–24 (Wash. 2002) (expressing the fourth and fifth elements of negligent misrepresentation as "(4) That [the plaintiff] relied on the false information supplied by [the defendant]; and (5) That

---

[4] At trial, a factfinder will be required to consider the evidence presented regarding Plaintiffs' informed decision to proceed in a single transaction, against the advice of both sides' agents, and to knowingly memorialize the agreement using standard-form real estate transaction documents. But because of Defendants' concession for the purpose of its summary judgment motion, the Court finds those facts are not material to any of its considerations here.

[5] Defendants do not directly raise the ninth element, consequent damages, as grounds for summary judgment dismissal of this claim. *See* Dkt. No. 26 at 28–30. Given the rulings on the other elements, the Court need not address the ninth element in this order.

[the plaintiff's] reliance on the false information supplied by [the defendant] was justified (that is, that *reliance was reasonable under the surrounding circumstances*)" (emphasis and alterations in original) (quoting *ESCA Corp. v. KPMG Peat Marwick*, 959 P.2d 651, 654 (Wash. 1998))), *with Elcon Const.*, 273 P.3d at 970 (stating the seventh and eighth elements of a fraudulent inducement claim as "(7) . . . reliance on the truth of the representation, [and] (8) the right to rely upon it").

Defendants essentially reiterate their arguments regarding specific terms included in the REPSA, including the Inspection Waiver Addendum and an Information Verification Period Contingency waiver, to argue that Plaintiffs (1) expressly disclaimed any reliance on prior representations and (2) are foreclosed by the independent duty doctrine (also known as the economic loss rule) from asserting a separate duty in tort from which a negligence cause of action may arise. Dkt. No. 26 at 27–28. Here, Plaintiffs correctly assert that Washington does not permit a broad application of the independent duty doctrine. *Eastwood v. Horse Harbor Found., Inc.*, 241 P.3d 1256, 1261 (Wash. 2010) ("[T]he broad application of the economic loss rule does not accord with our cases."). Further, "[w]hether a party justifiably relied upon a misrepresentation is an issue of fact." *ESCA Corp.*, 959 P.2d at 655. As previously noted (*see supra* Section III.D.4), Defendants' choice not to assert a defense based on the REPSA's integration clause requires the Court to consider Plaintiffs' facts regarding the course of dealings outside of the REPSA and beyond its express terms.

As such, the Court finds that a material dispute of fact as to justifiable reliance precludes summary judgment. The Court therefore DENIES Defendants' motion on Plaintiffs' negligent misrepresentation claim.

**F.      Conversion**

Defendants argue that Plaintiffs are unable to sustain their conversion claim on the facts presented. Dkt. No. 26 at 30. Plaintiffs' claim involves the alleged wrongful retention of the earnest money they agreed to pay in the course of dealings on the failed transaction. Dkt. No. 1-3 ¶¶ 56–58, 71, 153. The intentional tort of "[c]onversion . . . occurs when a person intentionally interferes with chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the rightful owner of possession." *Alhadeff v. Meridian on Bainbridge Island, LLC*, 220 P.3d 1214, 1223 (Wash. 2009) (en banc). "Money may become the subject of conversion, but only if the party charged with conversion wrongfully received the money, or if that party had an obligation to return the money to the party claiming it." *Brown ex rel. Richards v. Brown*, 239 P.3d 602, 609–10 (Wash. App. 2010). Here, there is no evidence that Defendants wrongfully received the earnest money. Plaintiffs willingly paid the money, and it converted to a non-refundable deposit pursuant to the terms of the Parties' agreement prior to the transaction failing. Dkt. No. 26 at 34. Plaintiffs do not dispute these facts. Instead, Plaintiffs argue that the agreement requires return of the earnest money upon the Defendants' breach. Dkt. No. 36 at 24. Because Plaintiffs' breach of contract claim against Defendants fails (*see supra* Section III.C), there is no evidence of wrongful retention per the Parties' agreement. Plaintiffs offer no other evidence to show that Defendants have wrongfully retained the otherwise non-refundable deposit. Therefore, the conversion claim also fails as a matter of law.

As such, the Court GRANTS Defendants' motion on this claim and DISMISSES Plaintiffs' cause of action for conversion.

**G.      Unjust Enrichment**

Defendants argue that their retention of the earnest money is not "unjust," either legally or morally. Dkt. No. 31 at 34. An unjust enrichment claim arises from "notions of fairness and

1    justice." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). "[T]he elements of [an unjust

2    enrichment claim] are: (1) the defendant receives a benefit, (2) the received benefit is at the

3    plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the

4    benefit." *Id.* Plaintiffs' claim arises from the simple fact that this transaction failed, and each side

5    blames the other for its failure. There is no doubt that Defendants benefitted from the earnest

6    money payment at Plaintiffs' expense. Whether "the circumstances make it unjust" for

7    Defendants to retain the earnest money is an inherently fact-dependent inquiry. Here, a factfinder

8    could reasonably conclude that either Party is at fault for the failed transaction, even though

9    neither can be found to have breached the contract as a matter of law (*see supra* Section III.C).

10       As such, the Court DENIES Defendants' motion on this claim, and Plaintiffs' unjust

11   enrichment claim shall proceed to trial.

12   **H.    Unclean Hands Defense**

13       Defendants seek summary dismissal of all of Plaintiffs' claims under the affirmative

14   defense of unclean hands. Dkt. No. 26 at 31–32; Dkt. No. 79 at 2–3. The ancient doctrine of

15   unclean hands arises in equity to prohibit a plaintiff from recovering for damages "[w]hen the

16   plaintiff has been guilty of a fraud which [produced] the injury of which he seeks redress." *J.L.*

17   *Cooper & Co. v. Anchor Sec. Co.*, 113 P.2d 845, 857 (Wash. 1941). Defendants' arguments are

18   based on Plaintiffs' alleged "withholdings and misrepresentations" to Key Bank in attempting to

19   secure financing for the failed transaction. Dkt. No. 26 at 32. Defendants attempt to relate these

20   alleged misdeeds to "the injury of which [Plaintiffs'] seek[] redress," *see J.L. Cooper & Co.*, 113

21   P.2d at 857, by arguing that the entire litigation may have otherwise been avoided because the

22   deal would have failed if Plaintiffs were honest with Key Bank. Dkt. No. 26 at 32; Dkt. No. 84

23   at 3 (noting that "the transaction hinged on securing financing. . . . [and] without financing,

24   Plaintiffs could not close").

The Court is not convinced that this is how the unclean hands doctrine is meant to operate. Plaintiffs correctly note that the doctrine generally does not apply when the purported wrongdoing was perpetrated against an outside party. *McKelvie v. Hackney*, 360 P.2d 746, 752 (Wash. 1961) ("Fraud or inequity practiced against a third person, who does not complain, does not close the doors of equity to a plaintiff guilty of no inequity as against a defendant."). Further, here, it appears that the alleged "omissions and misrepresentations" were made in furtherance of the transaction from which Defendants would have greatly benefited, especially because it would have allowed for the deal to close faster than if Plaintiffs had pursued separate financing for the business sale. Dkt. No. 36 at 5. Plaintiffs' financing activity, therefore, cannot be said to have "produced" the injuries (in this case the lost earnest money and other alleged consequent damages) for which Plaintiffs "seek redress," which arise instead from the fact that the deal failed anyway. *See J.L. Cooper*, 113 P.2d at 857. "In the interests of right and justice the court should not automatically condone the defendant's [alleged] infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public." *Republic Molding Corp. v. B. W. Photo Utils.*, 319 F.2d 347, 350 (9th Cir. 1963).

For these reasons, Defendants' unclean hands defense, based on Plaintiffs' financing activities with Key Bank, fails as a matter of law. The Court therefore DENIES Defendants' motion on their unclean hands affirmative defense.

## I.    Costs and Fees

Defendants ask the Court to award costs and attorney fees pursuant to a term included in the REPSA. Dkt. No. 26 at 33. Because Defendants have not entirely prevailed on summary judgment, and this case will proceed to trial, the Court DENIES Defendants' motion for costs and fees.

## IV.  CONCLUSION

Accordingly, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment (Dkt. No. 26) and DENIES Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 31). Plaintiffs' claims for breach of contract and for conversion are DISMISSED.

Dated this 14th day of September 2023.

Tana Lin
United States District Judge